Ann B. LOVELL, et al., Plaintiffs,

v.

PEOPLES HERITAGE SAVINGS
BANK, et al., Defendants.

Civ. No. 88–0059 P.

United States District Court,
D. Maine.

March 31, 1993.

John Campbell, Richard Poulos, Portland, ME, for plaintiffs.

Ralph Lancaster, Daniel Snow, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, ME, for defendant Peoples Heritage.

Alfred Frawley, George Isaacson, Brann & Isaacson, Lewiston, ME, for defendant Weston Boney.

Stephen Hessert, Peter Detroy, Portland, ME, for defendant Robert Marden.

Thomas Warren, Asst. Atty. Gen., Augusta, ME, for defendant H. Dematteis.

## MEMORANDUM AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

GENE CARTER, Chief Judge.

In this action arising from the conversion of Peoples Heritage Bank from a mutual savings bank to a stock savings bank, Plaintiffs have asserted both federal and state

claims against the Defendants. This Court granted summary judgment for the bank Defendants, Peoples Heritage, Weston Bonney and Robert Marden, on Counts II and III of the amended complaint by order of October 15, 1991 (Docket No. 51).[1] Defendant DeMatteis, who was joined as a party in his official capacity as Maine's Superintendent of Banking, was dismissed as to Counts X and XII and as to those portions of Counts I, II, III, and XI which were based on state statutes or the state constitution.[2] Remaining for adjudication, therefore, are Count I, alleging that the conversion of Peoples Heritage violated the Takings Clause, Due Process Clause and Contract Clause of the United States and Maine Constitutions, Counts IV through IX, alleging state common law claims based on the conversion, and Counts X through XII, alleging that the conversion violated state statutory law and the state and federal constitutions.

The allegations in this case are identical in most respects to the allegations in *Lovell v. Maine Savings Bank*, Civ. No. 87–296–P–C (March 31, 1993).[3] Also, the basic premise underlying the claims, that Plaintiffs, as owners of the mutual savings bank, were entitled to a distribution of the net worth of the bank upon conversion is the same in both cases. After this Court acted on the initial motions in this case, it determined both that there were certain questions of Maine law which might be determinative of the cause in the *Maine Savings Bank* case and that there were no controlling Maine precedents on those issues. The Court, therefore, certified

five questions of Maine law to the Supreme Judicial Court of Maine sitting as the Law Court. (Docket No. 134). The Law Court accepted the certification and issued its opinion answering three of the questions[4] in August, 1992. *Lovell v. One Bancorp*, 614 A.2d 56 (Me.1992). Because of the similarities of the two cases, after issuance of the Law Court's opinion, the Court invited Defendants in both cases to file renewed motions for summary judgment. The Court has decided the motions in the Maine Savings case and will now address the motions of Defendants here, which are very similar to those presented by the Defendants in the other case.

Under Federal Rule of Procedure 56(c), summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Court of Appeals for the First Circuit has recently stated:

> When, as here, the movant-defendant has suggested that competent evidence to prove the case is lacking, the burden devolves upon the nonmovant-plaintiff to "document some factual disagreement sufficient to deflect brevis disposition." ...
>
> This burden is discharged only if the cited disagreement relates to a genuine issue of material fact. ... "In this context, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the

---

1. The Court's prior opinion failed to address specifically Plaintiffs' claims in Counts II and III which were based on the Maine Constitution. Since both equal protection and contract clause claims require the same analysis and yield the same results under the Maine and United States Constitutions, *see State v. Chapin*, 610 A.2d 259, 261 (Me.1992); *Blount v. Dept. of Educational and Cultural Services*, 551 A.2d 1377, 1378 (Me. 1988); *Clark v. Rust Engineering Co.*, 595 A.2d 416, 419 (Me.1991), the Court's order granting summary judgment on Counts II and III must be read as disposing of the state constitutional claims as well as the federal.

2. Superintendent DeMatteis did not join in the bank Defendants' initial motion for summary judgment. The Court's determination that Plaintiffs failed to state an equal protection claim in

Count II or a constitutional claim in Count III resolves those issues for Superintendent DeMatteis as well.

3. Count I of each complaint is the same. Counts IV–IX, setting forth Plaintiffs' state common law claims based on the conversion are the same as Counts IV–VIII and XIII in the other case, and Counts X–XII are the same in both complaints except that damages are sought in the alternative in this case as well as equitable and declaratory relief.

4. Because of Plaintiffs' representations about the relief they are seeking and the Law Court's response to the three questions answered, no response was required to the remaining two questions.

nonmoving party [and] 'material' means that the fact is one that might affect the outcome of the suit under the governing law." ... This requirement has sharp teeth: the plaintiff "must present definite, competent evidence to rebut the motion." ...

*Wynne v. Tufts University School of Medicine*, 976 F.2d 791, 793 (1st Cir.1992) (citations omitted). The following facts are undisputed.

Plaintiff Ann Lovell and John Lovell, for whom she acts as personal representative, were account holders at Defendant Peoples Heritage Bank, when it converted from mutual to stock form in 1986. Peoples Heritage was created through the merger of five mutual savings banks chartered between 1852 and 1869. Until its conversion, Peoples Heritage operated as a mutual financial institution, as defined by the Maine Banking Code, 9–B M.R.S.A. §§ 131(27), 321–24, under the charter of the former Penobscot Savings Bank. That charter provided in part:

> Said corporation shall ... be subject to all the duties and liabilities, and enjoy all the rights and privileges conferred upon similar institutions by the laws of this state. Sect. 2. Said corporation is authorized to receive deposits of money, and such deposits of money shall be used and improved to the best advantage, and may be withdrawn at such reasonable times and in such manner as said corporation shall appoint; and the net income or profit thereof shall be divided among the persons making such deposits, ... in just proportion.

P & S.L. 1869, ch. 12.

On August 26, 1986, the Bank's Board of Directors approved a conversion plan under which the bank would change form from a mutual savings bank to a stock financial institution. Maine's Superintendent of Banking had never promulgated rules or regulations governing conversions. He had, however, issued Bulletin 41, explaining that the Federal Home Loan Bank Board (FHLBB) regulations contained guidelines for the contents of a plan of conversion that could be used by Maine banks. The substantive terms of the Bank's conversion plan were essentially the same as those required by the FHLBB.

The plan proposed by Peoples Heritage did not provide for the distribution of any cash, or any free or discounted stock, to existing or eligible account holders of the Bank. All shares of stock were to be sold to account holders, officers or employees, and the public, at a uniform price based upon an independent outside appraisal. The plan also provided for the creation of a liquidation account, setting forth the priorities and method of distribution to eligible account holders of any net surplus of the bank in the event of its liquidation while solvent. In the view of Maine's Superintendent of Banking such a solvent liquidation is highly unlikely.

Legal notices of the Bank's intention to convert were published in five newspapers in late August and early September, 1986, and the plan was submitted to Maine's Bureau of Banking for approval. At the behest of the Superintendent of Banking, the bank caused to be published in the same five papers a notice of acceptance of the application for conversion. The notice stated that interested parties could submit written comments on the application and requests for a hearing. No account holders responded to the published notice.

On October 22, 1986, the Superintendent issued an order conditionally approving the conversion. Announcements of the order appeared in Maine papers, and Peoples Heritage placed legal notice of it in the same five papers where the initial notice had appeared. Account holders meetings to inform depositors of the proposed conversion were scheduled in twelve Maine communities between November 3 and 13, 1986. Notices of these informational meetings were also published in the five papers. A special meeting of account holders at which they could vote on the conversion was scheduled for November 26, 1986. A notice of this meeting was mailed to each account holder by October 29, 1986. This mailing also included a summary description of the plan of conversion, a copy of the plan itself, a brochure entitled Questions and Answers on Stock Conversion, notice of the regional meetings, a ballot to vote on the conversion with a reply envelope, a subscription offering circular and a stock or-

der form with reply envelope. Included in the summary plan description was also a description of the right to judicial review under Maine law of the Superintendent's approval of the conversion plan. No review of the Superintendent's action was sought.

On November 26, 1986, the conversion plan was approved, with 3701 Peoples Heritage account holders out of approximately 119,000 eligible account holders voting either in person or by proxy. There were 3,199 votes in favor of the conversion and 502 against it. Plaintiffs Lovell voted against the conversion and had their counsel deliver a letter to the bank prior to the meeting, stating their objections. After Peoples Heritage certified to the Superintendent that its account holders had approved the conversion, the Superintendent, on December 11, 1986, issued the final Certificate of Conversion pursuant to 9–B M.R.S.A. §§ 343(4)(B) and 344. Neither the Lovells nor anyone else sought judicial review of the granting of the Certificate of Conversion.

The stock subscription offering occurred until November 26, 1986. Of eight million total shares, 2,978,576 were subscribed, providing the bank with $46,168,083 of new capital. Through a public stock offering, the bank sold 5,021,414 shares for an additional $77,831,917. The bank converted on December 11, 1986, and all the shares were issued on that date. Later in December 1.2 million more shares of stock were sold to the underwriters for $14,496,000.

In the view of the bank officers, a major purpose of the conversion was to ensure the future safety, growth and performance of the Bank by providing increased net worth and equity capital. The Superintendent of Banking also believed that the purpose of allowing conversions was to raise capital. The Superintendent was concerned that if converting mutual savings banks in Maine paid distributions to account holders at the time of conversion, a substantial number of deposits might be induced to move from stock institutions, where no such windfall was possible, to mutual institutions which might still convert so they might participate in such distributions. This concern was in accordance with the findings of the Federal Home Loan Bank Board. This account-shifting phenomenon, in the Superintendent's opinion, would be disruptive to the financial system.

The following two questions certified to the Law Court are pertinent to this case:

1. Does (1) the Certificate of Conversion issued by the Maine Superintendent of Banking on June 7, 1984, or (2) the time limits for obtaining judicial review of final agency action under the Maine Administrative Procedure Act, 5 M.R.S.A. § 11002, or (3) both in combination, bar Plaintiffs' claims for relief asserted under Maine common law and under the Maine Administrative Procedure Act, the Maine Banking Code (9–B M.R.S.A. §§ 343, 344) and the Maine Corporation Code (13–A M.R.S.A. § 608(1)(a)?

3. Under Maine law, do depositors of a mutual savings bank have the enforceable right to a distribution of the surplus of any bank when it converts to stock form pursuant to 9–B M.R.S.A. § 344, in the absence of a charter provision providing any more than that set forth in Chapter 328, P. & S.L. of 1859 (the charter of Maine Savings Bank's predecessor, the Portland Five Cent Savings Institution)?

The Law Court answered the certified questions as follows:

1. Plaintiffs' claims for relief asserted under Maine common law are barred by the certificate of conversion issued by the Superintendent of Banking on June 7, 1984 and the time limits for obtaining Judicial review of final agency action, 5 M.R.S.A. § 11002. We decline to answer question 1 as it relates to plaintiffs' claims asserted under Maine statutory law.

3. In the absence of a charter provision providing any more than that set forth in chapter 328 of P. & S.L. of 1859, depositors in a mutual savings bank do not have the enforceable right to a distribution of the surplus of any bank when it converts to stock form pursuant to 9–B M.R.S.A. § 344.

*Lovell v. One Bancorp,* 614 A.2d at 67.

## Count I

Count I alleges that the conversion effected a taking of Plaintiffs' property, impaired

their contractual rights, and denied them due process, all in violation of the Maine and United States Constitutions. The Court has thoroughly discussed these claims, which are identical to those presented by Plaintiffs in the Maine Savings case, in its opinion in that case. *Lovell v. Maine Savings Bank*, Civ. No. 87–296, slip op. at 14–24. For the reasons stated there, the Court finds that summary judgment is also appropriate for Defendants in this case on Count I.[5]

### Counts IV, V, VI, VII, VIII, IX

 Counts IV through IX set forth claims under Maine law for breach of contract, breach of fiduciary duty, fraudulent and negligent misrepresentation, conversion, and unjust enrichment. The same claims were brought by Plaintiffs in the *Maine Savings* case. Based on the Law Court's answer to the certified questions concerning the viability of such state common law claims, *Lovell*, 614 A.2d at 62–63, this Court determined that Plaintiffs' state common law claims were barred. *Lovell v. Maine Savings Bank*, slip op. at 26. The same reasoning and result obtain here.[6]

### Counts X, XI, XII

Alleging violations of Maine statutory law, Counts X, XI, and XII seek declaratory and equitable relief or, in the alternative, damages for alleged defects in the conversion process. Count XI also alleges that the notice of the conversion provided to Plaintiffs was constitutionally inadequate, denying them due process under both the Maine and United States Constitutions. This case differs somewhat from the *Maine Savings* case,

in which this Court, in the first instance, found Plaintiffs' claims in the parallel counts moot. *Lovell v. Maine Savings*, slip op. at 28–29. Here, Peoples Heritage still exists, and Plaintiffs seek damages as well as equitable relief. These counts, therefore, are not moot.

The Court found in the alternative in *Maine Savings* that the state statutory claims were barred by the certificate of conversion, which constitutes "conclusive evidence ... of the correctness of all proceedings," 9–B M.R.S.A. § 343(4)(B), because Plaintiffs' had failed to seek review of it in the statutorily-prescribed manner. *Id.* at 29–30. That reasoning and the result are also appropriate on the facts presented here. Thus, summary judgment is in order for Defendants on the state statutory claims set forth in Counts X, XI, and XII.

Plaintiffs due process argument concerning notice in this case is the same as that raised by Plaintiffs in *Maine Savings*. Both because Plaintiffs have no property interest meriting constitutional protection and because they received adequate notice before the conversion and alleged deprivation took place, Plaintiffs, like the Plaintiffs in *Maine Savings*, are entitled to no relief on the constitutional claims set forth in Count XI. *Lovell v. Maine Savings*, slip op. at 30–32.

Accordingly, it is *ORDERED* that Defendants' Motions for Summary Judgment be, and they are hereby, GRANTED.

SO ORDERED.

---

5. In *Lovell v. The One Bancorp*, 614 A.2d 56, which informed this Court's prior opinion, the Law Court determined that depositors in a mutual savings bank do not have an enforceable right to the distribution of the surplus of any bank when it converts to stock form. The question was certified and responded to in the specific context of a bank with a charter containing no more than that set forth in chapter 328 of P. & S.L. of 1859, the charter of Maine Savings' predecessor bank. The Law Court made plain in its opinion that its answer referred to charters with language identical to that found in the charter of Peoples Heritage's predecessor, which provided that the profit of mutual savings banks should be divided among the depositors. *See, Lovell*, 614

A.2d at 65. This Court, therefore, can safely rely on the Law Court's explanation of the *Maine Savings* Plaintiffs' interests under Maine law to inform its decision here as well.

6. In the Maine Savings case, the Court decided in the alternative that Plaintiffs could not recover on the state common law counts because they had not suffered the injury claimed. *Lovell v. Maine Savings Bank*, slip op. at 27. This conclusion, based on the Law Court's determination that Plaintiffs have no enforceable right to a distribution of the net worth of Maine Savings upon conversion, also applies here.